

**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service
Division of Federal
Occupational Health

Region IV
101 Marietta Tower
Room 1221
Atlanta, Georgia 30323

November 12, 1997

Ms. Barbara M. Brown
Chief
Recruitment and Employment Services
The Immigration and Naturalization Service
425 I St. NW
Washington, DC 20536



GOVERNMENT
EXHIBIT

    RE:    **MR. TYRONE RODRIGUEZ
           INS - APPLICANT**

Dear Ms. Brown:

> **I believe that there is sufficient evidence to support the diagnosis of delusional disorder with persecutory features. It is my opinion that a diagnosis of delusional disorder is incompatible with the safe and efficient performance of the duties and responsibilities of a Border Patrol Agent. I firmly recommend against placing Mr. Tyrone Rodriguez in the position of Border Patrol Agent.**

## SUMMARY OF THE FACTORS CONSIDERED IN THE RISK ASSESSMENT:

1.  Dr. Ballentine and Dr. Saavedra (Psychiatrists) derived their clinical opinions through direct observation and interviews with Mr. Rodriguez. Both Psychiatrists established the DSM-IV diagnosis of Delusional disorder with persecutory features.

2.  The impact of a delusional disorder on the expected job performance of a Border Patrol Agent carries an unacceptable risk which involves the potential for:

    a.  Injury or death associated with a misinterpretation or misperception of dangerous safety-sensitive scenarios commonly encountered on the job.

    b.  The potential of inaccurate reporting of events that could be used against the officer and The Immigration and Naturalization Service in a court of law, i.e., the risk of witness impeachment. Thus, adversely affecting the mission of the Immigration and Naturalization Service.

3.  Dr. Saavedra, whose interview was done more than a month after the interview by Dr. Ballentine, was aware of the background circumstances, history and the analysis of Dr. Ballentine when she came to her conclusions that Mr. Rodriguez has a delusional disorder with persecutory features. Moreover, in her opinion, he was also paranoid. In addition, Mr. Rodriguez demonstrated anger sufficient to cause this Psychiatrist to fear retaliation against her given the fact that her opinion was not contradictory to Dr. Ballentine's as Mr. Rodriguez had hoped and her understanding of the potential behaviors associated with the diagnosis.

4.  The opinion of Dr. Bartlett a trained clinical psychologist appears to be in conflict with the two psychiatric opinions. However, the conclusions and interpretation of the test battery that supported his position was done without the benefit of Mr. Rodriguez's background factors, beliefs and an accurate employment history. It is

000269

my opinion, that Dr. Bartlett is highly qualified practitioner and he provided the test results and conclusions within the scope of what he was asked to do. In a psychological screening, as with a general medical examination, a practitioner can't be expected to uncover every diagnosis. Clearly, the more information available or repeated examinations would increase the probability of finding pathologic conditions.

5. I had extensive telephone conversations with Dr. Bartlett, the clinical psychologist that administered the psychological tests and Dr. Robin Inwald the clinical psychologist that created the bulk of the test battery. The conversations dealt with the sensitivity and specificity of her tests with the diagnosis of delusional disorder. The test battery more accurately identifies abnormal behaviors and thinking when sufficient background data accompanies testing and conducting the interview, as explained by both Psychologists.

6. Dr. Robin Inwald stated that the test results were correctly interpreted by Dr. Bartlett as a psychological screening tool for safety sensitive jobs combined with the initial interview. But, the assessment and recommendations would be different if the past history of his behaviors and a discussion of his beliefs were available to Dr. Bartlett. Dr. Inwald stated that tests performed in a vacuum are limited in the ability to reveal the full scope of a person's belief system, behaviors or personality characteristics. Dr. Bartlett briefly mentioned in his telephone conversation with me, "remember the number of people that successfully pass a polygraph test that were proven to be lying with historical data" (or forensic evidence). If the polygrapher didn't explore questions that elicited the physiologic response to which the test is sensitive, wrong conclusions are inevitable. Knowing what questions to ask comes from the background data

7. There is evidence that some of Mr. Rodriguez's answers regarding his background were deceptively stated to Dr. Bartlett. See Mr. Ted Schwartz's statements in the seventh paragraph under the "discussion" heading below. Apparently, Mr. Rodriguez convinced Dr. Bartlett not to explore the circumstances of his dismissal from the Florida Department of Corrections in particular detail.

8. The dates of the clinical evaluations revealed that the delusional beliefs remained in place for longer than a month in duration

9. Treatment was suggested by Dr. Saavedra that was refused by Mr. Rodriguez. It is reasonable to assume that treatment should be rendered through counseling and combined with medication for this diagnosis. If Mr. Rodriguez seeks treatment (considering the etiology of the symptom as been identified), it will take a substantial amount of time before a Psychiatrist or Psychologist can reasonably assume that the condition has resolved.

10. In my opinion, there is no form of reasonable accommodation for the condition of delusional disorder. It is my opinion, that the Agency must be assured that the condition no longer exists before a responsible management decision to hire the individual in a Border Patrol Agent's job is rendered.

11. Developing a medical/psychiatric surveillance system to determine when Mr. Rodriguez's symptoms and/or the pharmacologic effect of the medication (if applicable) would allow for the safe and efficient performance of a Border Patrol Agent's duties is virtually impossible.

**000361**

2

High certainty and low severity of an adverse outcome:
  Recommendation: Outline the potential risks based on the available



12. There is no current evidence to show that the condition has been thoroughly evaluated (determination of etiology) and appropriately treated. It is logical to conclude that the condition remains active.

Performing a risk evaluation takes account of workplace factors as well as the individual's risk factors. Risk factors are medical or mental conditions that may result in an adverse outcome. For example, hypertension is a risk factor for a heart attack. In the evaluation of an individual's fitness and risk of injury on a job there are several factors that must be considered:
  1. Identification of the risk factors.
  2. Prediction of adverse outcomes given the presence of the risk factors. This determination considers the anticipated job demands and exposures.
  3. Two additional issues must be assessed.
     a. The level of certainty attainable about an adverse outcome..
     b. The severity of the health outcome to be prevented.
  4. Judgement and integration of the available data and risk communication to the administration.

The certainty of an adverse outcome requires confidence in the diagnosis and thorough knowledge of the job duties, exposures and the working environment. The severity of the adverse outcome has several dimensions. One is the clinical impact on the affected individual, i.e. the avoidance of death would obviously warrant stricter measures than the avoidance of dermatitis. Another dimension is the impact on other employees or the general public's health, e.g., an uncontrolled seizure disorder has greater public health importance in a school bus driver than with a secretary. Other individual considerations include the degree of impairment and/or the likelihood of recurrence of the adverse outcome.

Calculating the probability of an adverse outcome requires the probability of independent events (the individual's risk factor & a job exposure or demand) occurring at the same time then the probability that an adverse outcome will occur conditionally related to the presence of the identified risk factor. A permanently blind person should not be a Border Patrol Agent. Even with overwhelming statistical data available a numerical risk of an adverse outcome associated with a job demand given the presence of an individual's risk factor can't be calculated with accuracy. However, the basis for the recommendations in this risk assessment involves a thorough knowledge of the job, deductive reasoning, biologic plausibility, use of clinical knowledge and data and applying the general practice principles in my specialty of Occupational and Environmental Medicine.

The interaction between the dimensions of certainty and severity used in this risk assessment are outlined as follows:
Low certainty and low severity of an adverse outcome:
  Recommendation: Acceptance into the safety sensitive position is justified.
Low certainty and high severity of an adverse outcome:
  Recommendation: Outline the potential risks based on the available data but acceptance into a safety sensitive position is probably justified

000362

3

Rodriguez lacks social judgement according to the test results. Additionally, the HPP
test results strongly suggested that Rodriguez lacked sensitivity toward other people
and possibly suggests a sociopathic personality. Dr. Inwald refers to the results of the



   c. It was his opinion that the background information should have been
completely analyzed by INS prior to sending the applicant for a psychological
evaluation. If the background information appeared to be accurate, the
applicant probably should have been eliminated and no additional
psychological testing performed.

   d. Dr. Bartlett echoed the statements of Dr. Inwald (see below); the sensitivity of
testing and the validity of the findings increase with background information
on a person. Dr. Bartlett stated that it is quite possible for an individual to
present a good picture of himself or simply tell a lie on test questions or during
an interview which will alter the analysis and conclusions.

   e. Dr. Bartlett briefly mentioned the number of people that successfully pass a
polygraph test that were proven to be lying with historical data or forensic
evidence.

4. Direct conversation with Dr. Robin Inwald (Psychologist and author of the Inwald
Personality Inventory (IPI), the Inwald Survey 2 (IS2) and the Inwald Survey 5
(IS5), on November 7, 1997.

   a. She explained the sensitivity and the specificity of the psychological test
battery.

   b. She explained that the findings of Dr. Bartlett are valid in her opinion but given
the background history of the applicant there is supportive evidence on the test
that could correlate with a sociopathic personality. Dr. Inwald did not label the
applicant a sociopath but explained that behavior in a reasonably intelligent
individual may not be revealed on a battery of tests. Therefore, a more global
evaluation of the factors is necessary to increase the sensitivity of the test
battery.

5. An analysis by Ted Schwartz, ACSW dated May 21, 1997.

   a. Mr. Schwartz outlined the work history that revealed multiple dismissals over
several years.

   b. "...a clinical psychologist shows no abnormalities. However, the
Psychologist's report shows no investigation into the applicants beliefs."

   c. "In another instance, the psychologist references the private investigator
position that the applicant had acquired in late 1995

   d. "...applicant's 171 says the dismissal from a job was mutual. This does not
appear to be what happened..."

## DISCUSSION:
**The issues in the case involve the following:**

   1. The accuracy of the diagnosis of delusional disorder with persecutory
features and paranoia with a delusional disorder.

      a. The value of standardized personality tests in the diagnosis of
delusional disorders or evaluating the symptoms of delusions
regardless of etiology.

   2. The risk of injury or death to the officer, a partner and or the general public
directly associated with a delusion.

   3. The risk of impaired job performance such as writing factually inaccurate
reports associated with a delusional disorder.

The characteristic feature of a delusion is the false belief engendered without appropriate external stimulation. Delusions are misjudgements of reality. Given the responsibility of using deadly force, the Border Patrol Agent may chose to shoot an individual if it appears to the agent that the suspect intends to do harm etc. It is precisely the ability to correctly judge a situation that prompts the officer to draw his/her weapon, use non-lethal physical force or take a different action. In my opinion, a delusional individual will inherently have difficulties judging such situations at some point in time and the consequences of misjudgement could include death. Clearly, any person entrusted with the use of deadly force is expected to have rational judgement at all times, good to excellent cognitive function and be free of any disorder, substance or medical condition that may alter mental function.

Evidence of the chronicity of Mr. Rodriguez's delusional disorder and possibly worsening of the condition is found in following statements given to the psychiatrists;
1. Dr. Ballentine's letter in May of 1995, "... he believed there was a country-wide retaliatory effort by the Bureau of Prisons to 'destroy my reputation and create a hostile work environment for me', he denied similar problems in any other position."
2. "He believed that the harassment and discrimination he was having on his job was a continuing problem from previous employers." This belief was brought out during Dr. Saavedra's session in July 1995.
These conflicting statements may reflect a deterioration of his condition or an effort to exaggerate the factors for secondary gain?

**Regarding issue #3 above:**
The job responsibilities of a Border Patrol Agent requires good to excellent cognitive skills and memory. By definition, an individual with delusions will mentally misinterpret the factors of a situation and report or act upon what s/he believes to be the truth despite irrefutable evidence to the contrary. For example, writing a report requires, in part, a recollection of the sequence of events and facts, mental interpretation of the memory, and producing a written report. Memory is a very complex mental function that involves the reproduction of what has been learned or experienced and includes:
      A. Primary response, conscious perception, apperception (comprehension), full apprehension of any psychic content. The primary response is affected by many factors such as previously learned responses, beliefs, fatigue, medical conditions, medications, psychoactive substances, etc.
      B. Short-term retention – a transient holding of information which decays rapidly with time.
      C. Long-term retention
      D. Retrieval
Activation or read-out of the retrieved material is a process that is affected by the rest of the mental status / function. Activation can be adversely affected by an individuals ability to interpret the meaning of observations and events laid down as a memory trace. Persons with delusions will obviously have difficulty with the interpretation of retrieved material. If the officer experience is delusional, the distorted thought will be recorded. The inevitable conflict will adversely impact the mission of The Immigration

and Naturalization Service. Defense attorneys will investigate an officer providing conflicting or damaging information about a suspect. As a point of history, the investigation into Officer Mark Furhman's background revealed a conflict that proved to be one crucial turning point in the first trial of O.J. Simpson. An officer that can be impeached as a witness is obviously of little value to The Immigration and Naturalization Service. Impeachment could come two ways:

    i.    The discovery of a medical history of a delusional disorder lasting more than one month. A defense attorney will use this information to claim that the perception wrong doing by his/her client is obviously affected by the officer's mental condition.

    ii.    The production of a report by an officer whose facts are not supported by reality and are reported differently by other observers especially another Border Patrol Agent

My assumption of a performance conflict reflects the risk of delusional thoughts occurring again in Mr. Rodriguez and the logical impact such thinking would have on the accuracy of reports generated by the individual. Example, the accuracy of information given to the psychiatrists by Mr. Rodriguez is conflicting. (see above).

**Regarding issue #4 above:**
The Agencies first responsibility is to carry out its mission. Hiring individuals that are capable of performing the jobs necessary to accomplish the mission of the INS requires a risk assessment of their mental and physical capabilities for the jobs that are designated as arduous and hazardous and have medical standards. Failure of an individual to safely and efficiently perform the duties and responsibilities will directly affect the mission of the INS and may result in injury or death of the employee, a co-employee or the someone in the general public. All weapons bearing job positions in the INS are designated arduous and hazardous and requires a constant state of mental and physical readiness given the inevitable and unpredictable confrontations with suspects.

**Regarding issue #5 above:**
Determining the risk of failure or identifying the inability to perform the safety-sensitive duties and responsibilities of a job is the Agency's responsibility. Likewise, the Agency sets its guidelines for the minimal acceptable mental and physical requirements necessary to perform the arduous and hazardous jobs. The INS establishes a minimal cutoff point and identifies certain diagnoses as being unacceptable because of its knowledge of the job exposures, hazards, requirements, responsibilities, as well as, the various working environments. Requirement of a pre-placement physical examination assists in the risk assessment. The authority for such an examination is provided in the CFR Subpart C §339.301

At what point will the agency refuse to take a risk? The answer to this question lies in the estimated probability for physical injury or unacceptable work performance that could hurt the mission of the agency which forms the basis of the medical standards.

A delusional individual may not have the appearance of impairment such as an blind individual or a quadriplegic person that is blatantly impaired. The issue of subtle

incapacitation involves a condition that can directly interfere with the performance of a job duty but may not surface as a problem until certain job demands are encountered, usually safety sensitive job demands. For example, an individual with a history of asthma appears to be normal when the symptoms are not active but if s/he has to run full speed suddenly in sub-zero weather, they may develop an incapacitating asthmatic attack. As a direct result, the individual becomes totally incapacitated, vulnerable to attack and the mission of the INS becomes jeopardized. It is also important to acknowledge the potential consequences of blatant or subtle incapacitation. A Border Patrol Agent's job deals with confrontations with potential suspects, physical altercations, possible use of weapons, high speed vehicular pursuits and many other safety-sensitive duties. The consequences may include injury or death. Therefore, it is imperative to rule out conditions that could increase the risk of injury or death to the employee, other officers or the general public because the working environment, the criminal population and the responsibilities of the position can't be modified. Unlike asthma, a mental condition such as delusional disorder is much more difficult to identify unless there is a significant history coupled with psychiatric or psychological evaluations as discussed earlier.

CFR Subpart C §339.302 gives the authority to the agency to order a medical examination (including a psychiatric evaluation) in any situation where the agency needs additional medical documentation to make an informed management decision about an employee. The apparent reason for providing this authority centers on safety and job performance. In Mr. Rodriguez's case, there is work history and recent pattern (performance) plus two psychiatric evaluations identifying a psychiatric condition as a plausible explanation. It is my current opinion that sufficient evidence is present to recommend against placement into the safety-sensitive position of Border Patrol Agent.

## LEGAL CONSIDERATIONS:
§CFR Subpart C §339.301   (Code of Federal Regulation) Authority to require an examination.

a.  A routine pre-appointment examination is appropriate only for a position which has specific medical standards, physical requirements, or is covered by a medical evaluation program established under these regulations.

b.  Subject to §339.103 of this part, an agency may require an individual who has applied for or occupies a position which has medical standards or physical requirements or which is part of an established medical evaluation program to report for a medical examination:
    (1) Prior to appointment or selection (including reemployment on the basis of full or partial recovery from a medical condition);
    (2) On a regularly recurring, periodic basis after appointment; or
    (3) Whenever there is a direct question about an employee's continued capacity to meet the physical or medical requirements of a position.

c.  An agency may require an employee who has applied for or is receiving continuation of pay or compensation as a result of an on-the-job injury or disease to

report for an examination to determine medical limitations that may affect placement decisions.

d.  An agency may require an employee who is released from his or her competitive level in a reduction in force to undergo a relevant medical evaluation if the position to which the employee has reassignment rights has medical standards or specific physical requirements which are different from those required in the employee's current position.

e.  (1) An agency may order a psychiatric examination (including a psychological assessment) only when:

    (i)    The result of a current general medical examination which the agency has the authority to order under this section indicates no physical explanation for behavior or actions which may affect the safe and efficient performances of the individual or others, or

    (ii)    A psychiatric examination is specifically called for in a position having medical standards or subject to a medical evaluation program established under this part.

    (2) A psychiatric examination or psychological assessment authorized under (1) or (ii) above must be conducted in accordance with accepted professional standards, by a licensed practitioner or physician authorized to conduct such examinations, and may only be used to make legitimate inquiry into a person's mental fitness to successfully perform the duties of his or her position without undue hazard to the individual or others.

§CFR 339.206 (Code of Federal Regulation)

*Disqualification on the basis of medical history.* This section states, "A candidate may not be disqualified for any position solely on the basis of medical history. For positions with medical standards or physical requirement or positions subject to medical evaluation programs, a history of a particular medical problem may result in medical disqualification only if the condition at issue is itself disqualifying, recurrence cannot medically be ruled out, and the duties of the position are such that a recurrence would pose a reasonable probability of substantial harm.

It is my opinion that a delusional disorder is disqualifying for the position of Border Patrol Agent. Given Mr. Rodriguez's history it is logical to assume that the disorder is still active. It is my belief based on years of experience rendering fitness-for-duty medical opinions for law enforcement jobs and training in my specialty of Occupational and Environmental Medicine that the duties of the position are such that a recurrence would pose a reasonable probability of substantial harm.

§CFR339.104 Definitions:

*Arduous of hazardous positions* means positions that are dangerous or physically demanding to such a degree that an incumbent's medical condition is necessarily an important consideration in determining ability to perform safely and efficiently.

*Medical condition* means health impairment which results from injury or disease including psychiatric disease.

The position of Border Patrol Agent meets the description of arduous and hazardous. The diagnosis of delusional disorder with persecutory features and paranoia, in my opinion, are impairing conditions in context to the requirments of the Border Patrol Agent's job.

## §CFR339.202 MEDICAL STANDARDS:

OPM (U.S. Office of Personnel Management) may establish or approve medical standards for a Government wide occupation (i.e., an occupation common to more than one agency). An agency may establish medical standards for positions that predominate in that agency (i.e., where the agency has 50 percent or more of the positions in a particular occupation). Such standard must be justified on the basis that the duties of the position are arduous or hazardous or require a certain level of health status or fitness because the nature of the positions involve a high degree of responsibility toward the public or sensitive national security concerns. See §CFR Subpart C §339.301 above.

When an agency obtains documentation like that of Mr. Rodriguez, it has a responsibility to determine if the documentation is sufficient to make an informed management decision or if additional information is necessary. I believe that the documentation is sufficient and that it is plausible to assume the disorder is still present. It is my recommendation that Mr. Rodriguez not be placed into the Border Patrol Agent's position based upon the documentation outlined earlier. I base this recommendation on the research through the psychiatric and psychological literature and the understanding that a condition such as delusional disorder with persecutory features and paranoia are unlikely to disappear without adequate treatment. A treatment recommendation requires the completion of a differential diagnostic work-up to determine the cause. Moreover, according to some articles reviewed, the prognosis depends on the duration of symptoms. Symptoms lasting less than 1 month had a better prognosis with appropriate treatment and symptoms lasting more than 6 months met the criteria for persistent delusional disorder and carries a less favorable prognosis.

## JOB REVIEW AND ANALYSIS: Border Patrol Agent

The Border Patrol Agent enforces the immigration and nationality laws and the corresponding criminal code and apprehends violators of these and other related laws within the jurisdiction of the Immigration and Naturalization Service. Through formal classroom training and on-the-job exposure to the management and operational activities of The Immigration and Naturalization Service, develops knowledge and skills necessary to perform more responsible assignments. Through leads, personal observation of persons and other means, the Border Patrol Agent:

a.    Detects individuals suspected of violating immigration laws.

b.    Questions such persons and inspects their documents to determine citizenship or alien status, using the Spanish language as needed to communicate.

c.    Searches for persons in vehicles, buildings, and outdoor areas. Observes and interprets physical signs of illegal entry into the country.

d.     Apprehends and searches violators: questions them and others involved, such as witnesses. Recommends to team leader or to the supervisor that suspect be held for further questioning or immediately returned to country of origin.

e.     Writes reports' concerning apprehensions, interrogations and other activities relevant to immigration law enforcement.

The Border patrol Agent (GS-1896-5, BMK#1) will be required to perform the following duties and handle the following responsibilities:

1.     Sign Cutting
2.     City patrol
3.     Routine traffic checks

Knowledge required by the Position – Level 1-4.

4.     Conduct interviews in English or Spanish and employ other information gathering methods and techniques sufficient to permit the agent to collect evidence, question suspects, identify violations and arrest violators.

5.     Must have skill in establishing, maintaining and improving interpersonal relationships sufficient to permit the agent to question suspects and others, collect information from groups and individuals with varying backgrounds, and make proper disposition.

6.     Must have skill in gathering factual information through questioning, observation of movements of persons across or near borders, examination of documents and records, and eliciting relevant data to locate and apprehend illegal aliens.

7.     Must have skill in interpreting and correctly applying laws, regulations, precedents and other instructional or informative material to assure that proper apprehensions are made.

The Scope and Effect – Level 5-2

8.     The purpose of the work is to: (1) enforce the Immigration and Nationality Act and related statues: and (2) provide exposure to and experience in the programs, policies and procedures of The Immigration and Naturalization Service and a basis for more responsible assignments. Successful completion of assignments facilitates the apprehension and expulsion of illegal aliens, prevention of unauthorized persons entering the United States and promotion of crime detection and prevention at and near the borders of the United States.

The Complexity - Level 4-2

9.     The work involves the application of a variety of institutionalized procedures and methods in controlled work situations and provides practical experience in the apprehension, interrogation, and processing of illegal aliens. Assignments typically involve aspects of work assigned to higher graded agents to provide specific types of practical experience or exposure to particular situations or problems.

Personal Contacts – Level 6-3

10. Personal contacts are with the general public, including legal and illegal immigrants, officials of other Federal agencies, e.g., the Department of Agriculture, Justice and Interior representatives of State and local governments, personnel from other law enforcement agencies, Federal and non-Federal, foreign officials and attorneys. These contacts are established on a non-routine basis and may take place in a wide variety of settings within or outside the sector or station.

**Physical Demands – Level 8-3**
11. Work requires considerable and strenuous physical exertion such as long periods of standing, walking, running over rough, uneven or rocky surfaces; driving standard and four wheel drive vehicles over rough surfaces, through cold timber land, or in hot, dry and dusty areas; climbing of various heights. Agent must be prepared to defend self and others against physical attack, resorting to the use of firearms only as a last resort.

**Work Environment – Level 9-3**
12. Work environment involves high risks with exposure to potentially dangerous situations or unusual environmental stress, such as operation of automobiles in high-speed chases, boarding moving trains and vessels, or possible gunfire. May be required to work long and irregular hours on weekends and at night, frequently changing shifts and duty stations. Assignments are subject to change without advance notice.

**JOB RELATED SAFETY & EFFICIENT PERFORMANCE CONCERNS:**
A correlation of some essential duties and responsibilities and the psychological requirements necessary to perform safely and efficiently.

Itemizing the following factors of job responsibility correlation with the mental function necessary to perform the job does not imply mutual exclusivity. Many of the job duties and mental requirements overlap. These categories are intended to broadly outline the more apparent mental functions a Border Patrol Agent (BPA) must have to perform.

**The job accords the officer the responsibility of making unplanned life and death decisions.**
1. The Border Patrol Agent is entrusted with the use of deadly force to be used when the circumstances leave no options.
2. Work environment involves high risks with exposure to potentially dangerous situations or unusual environmental stress, such as operation of automobiles in high-speed chases, boarding moving trains and vessels, or possible gunfire.

**The job requires a constant state of mental and physical readiness:**
1. The agent must be prepared to defend self and others against physical

2. attack resorting to the use of firearms only as a last resort. Searches for persons in vehicles, buildings, and outdoor areas.
3. The working environment involves high risks with exposure to potentially dangerous situations or unusual environmental stress, such as operation of automobiles in high speed chases, boarding moving trains, and vessels, or possible gunfire ...
4. The BPA enforces the immigration and nationality laws and the corresponding criminal code and apprehends violators
5. The BPA gathers factual information through questioning, observation of movements of person across or near borders, examination of documents and records and eliciting relevant data to locate and apprehend illegal aliens.

**The job requires clarity of thought and the ability to correctly interpret and immediately respond to potentially dangerous observations (sensory input – visual observations, auditory stimulation, tactile stimulation, and interpretation of linguistic communication in both English and Spanish)**

1. Through leads, personal observation of persons and other means, the Border Patrol Agent:
   a. Writes reports' concerning apprehensions, interrogations and other activities relevant to immigration law enforcement.
   b. Detects individuals suspected of violating immigration laws
   c. Questions such persons and inspects their documents to determine citizenship...
   d. Observes and interprets physical signs of illegal entry into the country.
   e. Must have skill in establishing, maintaining and improving interpersonal relationships sufficient to permit the agent to question suspects and others, collect information from groups and individuals with varying backgrounds, and make proper disposition.
   f. Must have skill in interpreting and correctly applying laws, regulations, precedents and other instructional or informative material to assure that proper apprehensions are made.

Placing any individual with a delusional thought disorder regardless of etiology and severity, in a position to make a unplanned decision to shoot an individual would be equivalent to gross negligence on the part of any agency, in my opinion.

These outlined categories represented the most critical job functions requiring intact cognition / judgement and perception. Each of these categories could result in direct physical harm to individuals or inappropriate litigation based upon the misinterpretation of a situation by an individual whose psychological condition is known to result in distorted perceptions.

CONCLUSION:
The conclusions are based on my belief that the accuracy of the diagnosis is good and the potential consequences of delusional thinking in context to the duties and

000377 (8)



responsibilities of a Border Patrol Agent could have devastating outcomes including death. The certainty of an adverse outcome is high and the severity of the adverse outcome could include someone's death.

I believe that the documentation presented is sufficient to recommend against placement into the position of Border Patrol Agent. I believe that the agency should have absolute confidence in the mental and physical capabilities of all officers entrusted with the use of a weapon and given law enforcement responsibilities.

It is my opinion that the application of "a reasonable degree of medical certainty, i.e. better than 51% probability" should **not** apply to an analysis of an individual with a diagnosis of delusions or any other symptom or condition that affects mental judgement. I believe the INS would be irresponsible in placing an individual in a position where altered mental judgement or perception could result in injury or the death of another person. The consequences of misjudgment or failure to react appropriately given the job exposures, duties and responsibilities carries the risk of diar health consequences. Therefore, I believe that caution must prevail until there is irrefutable evidence that the condition does not exist or has been completely resolved with a chance of recurrence equivalent to the emergence of the symptom in an individual that did not have the condition.

Sincerely,

Bruce N. Butler, M.D., M.P.H.
Medical Review Officer
Immigration and Naturalization Service
BNB/bb/Mr. Rodriguez.con.doc