§ 731.201                                    5 CFR Ch. I (1-1-91 Edition)

[40 FR 29047, July 3, 1975, as amended at 49 FR 1870, Jan. 16, 1984]

## Subpart C—Suitability Rating Actions

### § 731.201  Jurisdiction.

(a) *Appointments subject to investigation.* (1) In order to establish an appointee's qualifications and suitability for employment in the competitive service, every appointment to a position in the competitive service is subject to investigation by OPM, except:

(i) Promotion;

(ii) Demotion;

(iii) Reassignment;

(iv) Conversion from career-conditional to career tenure;

(v) Appointment, or conversion to an appointment, made by an agency of an employee of that agency who has been serving continuously with that agency for at least one year in one or more positions in the competitive service under an appointment subject to investigation; and

(vi) Transfer, provided the one-year, subject-to-investigation period applied to the previous appointment has expired.

(2) Appointments are subject to investigation to continue OPM's jurisdiction to investigate the qualifications and suitability of an applicant after appointment and to authorize OPM to require removal when it finds the appointee is disqualified for Federal employment. The subject-to-investigation condition may not be construed as requiring an employee to serve a new probationary or trial period or as extending the probationary or trial period of an employee.

(b) *Duration of condition.* The subject-to-investigation condition expires automatically at the end of 1 year after the effective date of appointment, except in a case involving intentional false statement or deception or fraud in examination or appointment.

[33 FR 12483, Sept. 4, 1968, as amended at 49 FR 1870, Jan. 16, 1984]

### § 731.202  Actions by OPM and other agencies.

(a) For a period of 1 year after the effective date of an appointment subject to investigation under § 731.201, OPM may instruct an agency to remove an appointee when it finds that the appointee is not qualified or is unsuitable for any of the reasons cited in § 731.202.

(b) Thereafter, OPM may require the removal of an employee on the basis of either intentional false statement or deception or fraud in examination or appointment; or refusal to furnish testimony.

(c) An action to remove an appointee or employee taken pursuant to an instruction by OPM is not subject to Part 752 of this chapter. Part 752 of this chapter applies when removal or other disciplinary action, covered by that part is initiated by an agency.

(d) When the Office instructs an agency to remove an appointee under this part it shall notify the agency and the appointee of its decision in writing, giving reasons for the decision, and informing the agency and the appointee of the right to appeal to the Merit Systems Protection Board under the provisions of the Board's regulations. The Office shall comply with the provisions of § 1201.21 of this title.

(e) Before OPM shall take a final suitability disqualification action against an applicant, eligible, appointee, or employee under this Part, the person against whom the action is proposed shall be given notice of the proposed action, an opportunity to answer, notice of the final decision of the action, and notice of rights of appeal, if any, all in accordance with 5 CFR Part 754. Before any agency having delegated authority from OPM under this Part takes a final suitability disqualification action against any person under this Part, the agency shall give such person the same notices and opportunities that OPM would be required to give in such a case under 5 CFR Part 754.

(5 U.S.C. 7701, et seq.)

[38 FR 32540, Sept. 9, 1974, as amended at 40 FR 28048, July 3, 1975; 44 FR 42954, Aug. 21, 1979; 49 FR 1870, Jan. 16, 1984; 49 FR 5601, Feb. 14, 1984]

### § 731.203  Debarment.

When a person is disqualified for any reason named in § 731.202, OPM, in its discretion, may deny that person examination for and appointment to a

position for a period of 3 years from the date of such action; or disqual for the period of debarment from who has been appointed or the appointee in the competitive service as determined by OPM.

[..., Sept. 4, 1968, as amended ... July 3, 1975)

## Subpart D—Appeal to the Merit Systems Protection Board

### § 731.301  Right to appeal.

(a) Any applicant or eligible disqualified from examination or appointment by the Office for any reason named in § 731.202 may appeal to the Merit Systems Protection Board under the Board's regulations.

(b) An appointee who is disqualified by the Office for any reason named in § 731.202 or his or her employing agency may appeal to the Board under the Board's regulations.

(1) An appointee who appeals a removal directed by OPM shall notify the agency of his appeal prior to the effective date of the removal.

(2) When OPM has instructed an agency to remove an appointee, either the agency or the appointee appeals, the agency shall separate the appointee effective the day following the date on which the removal was to have been effected pending adjudication of the appeal unless the agency decides to retain the appointee in an active duty status for that period, in which case the agency shall so notify the appointee. Part 752 of this chapter does not apply to the suspension.

(5 U.S.C. 7701, et seq.)

[39 FR 32541, Sept. 9, 1974, as amended at 40 FR 28048, July 3, 1975; 44 FR 42954, 21, 1979]

## Subpart E—Reemployment Eligibility

### § 731.501  Reemployment eligibility of certain former Federal employees.

(a) *Request for suitability determination.* When an employee is removed by an agency on suitability (other than security or loyalty) or resigned on learning the ...

24



(i) Designated High Risk under paragraph (a) of this section, or

(ii) That is a law enforcement or public safety position designated Moderate Risk under paragraph (a) of this section, shall be subject to a periodic reinvestigation of a scope established by OPM 5 years after placement, and at least once each succeeding 5 years.

(2) Periodic reinvestigations required by paragraph (c)(1) of this section may be adjudicated by the employing agency according to the procedures in this part, if applicable.

## § 731.303 Actions by OPM and other agencies.

(a) For a period of one year after the effective date of an appointment subject to investigation under § 731.301, OPM may instruct an agency to remove an appointee when it finds that the appointee is unsuitable for any of the reasons cited in § 731.202.

(b) Thereafter, OPM may require the removal of an employee on the basis of either intentional false statement or deception or fraud in examination or appointment; or refusal to furnish testimony; or statutory or regulatory bar.

(c) An action to remove an appointee or employee taken pursuant to an instruction by OPM is not an action under part 752, or §§ 315.804 through 315.806 of part 315, of this chapter.

(d) When OPM instructs an agency to remove an appointee or employee under this part it shall notify the agency and the appointee or employee of its decision in writing.

(e) Before OPM, or any agency having delegated authority from OPM under this part, shall take a final suitability action against an applicant, eligible, appointee, or employee under this part, the person against whom the action is proposed shall be given notice of the proposed action (including the availability for review, upon request, of the materials relied upon), an opportunity to answer, notice of the final decision on the action, and notice of rights of appeal, if any, all in accordance with this part.

## § 731.304 Debarment.

(a) When OPM finds a person unsuitable for any reason named in § 731.202, OPM, in its discretion, may deny that

person examination for and appointment to a competitive position for a period of not more than 3 years from the date of determination of unsuitability.

(b) On expiration of a period of debarment, a person who has been debarred may not be appointed to any position in the competitive service until OPM has redetermined that person's suitability for appointment.

## Subpart D—Suitability Actions

### § 731.401 Scope.

(a) *Coverage.* This subpart sets forth the procedures to be followed when OPM, acting under authority of this part, proposes to take or to instruct an agency to take, a final suitability ineligibility action, including removal, against an applicant or eligible for appointment in, or an appointee or employee in, the competitive service. This subpart does not apply to an action taken by an agency to which OPM has delegated authority under § 731.103.

(b) *Definition.* In this subpart, *days* means calendar days.

### § 731.402 Notice of proposed action.

(a) OPM shall notify the applicant, eligible, appointee, or employee (hereinafter, the "respondent") in writing of the proposed action and of the charges against the respondent. The notice shall state the reasons, specifically and in detail, for the proposed action. The notice shall also state that the respondent has the right to answer this notice in writing. If the respondent is an employee the notice shall further state that the employee may also make an oral answer, as specified in § 731.403(a). The notice shall further inform the respondent of the time limits for answer as well as the address to which such answer should be made.

(b) OPM shall send a copy of this notice to the agency, if any, that is involved. The notice shall be served upon the respondent by being mailed to the respondent's last known residence or duty station no less than 30 days prior to the effective date of the proposed adverse action. If the respondent is employed in the competitive service on the date the notice is served, the respondent shall be entitled to be re-

167-005 O-96——2

VI



ORANGE COUNTY LIBRARY SYSTEM
ZZ157140450

# CARING FOR THE MIND

## THE COMPREHENSIVE GUIDE TO MENTAL HEALTH

### Dianne Hales & Robert E. Hales, M.D.

Introduction by Allen Frances, M.D.

Chair, American Psychiatric Association Task Force on *DSM-IV*

Ex - VIII

...severity of the symptoms, the diagnosis may be of a depressive disorder or schizophrenia. Sometimes the phreniform disorder or schizophrenia. Sometimes the of a depressive disorder become more prominent as the improves with medication. It may turn out, for example, individual's psychotic symptoms developed as part of a sode in bipolar illness. In such cases, psychiatrists foc ing the underlying mental disorder.

## Delusional dis

**D**elusions are persistent beliefs that a person holds to disorder have an unshakable false belief concerning even can occur in real-life circumstances. Thus, they may belie a rock singer is in love with them, that a coworker is spr them, or that a spouse is unfaithful. In psychiatric terms, delusions are *well systematized*—that is, they fit into an ela encompassing conceptual scheme that makes sense to the vidual—and *encapsulated*—meaning they do not intrude on most aspects of the person's life. In contrast, the delusions tha occur in persons with schizophrenia tend to be bizarre, as in lieving, for example, that one has been befriended by Martian that their internal organs are changing shape.

▼ **How common is delusional disorder?**

Delusional disorder is relatively uncommon. Although this condi tion accounts for 1 to 2 percent of all annual admissions to psy chiatric hospitals. Its actual incidence in the general population is estimated to be only around 0.03 percent. Many cases begin in middle or late adult life, and occur slightly more often in women than in men. The average age of onset is between thirty-five and fifty-five.

▼ **What causes delusional disorder?**

The causes are not known. Psychosocial factors may lead to perse cutory delusions; one form described by mental health profession als is *migration psychosis*, usually persecutory, found in persons migrating from one nation to another. Paranoid, schizoid, or avoid ant personality disorders (described in Chapter 21) may increase the likelihood of delusional disorders.

▼ **How delusional disorder feels**

Most individuals with a delusional disorder look and act more or less normally *unless* they are talking about or acting on their delusion, although many are angry, hostile, or suspicious. Some

Most delusions are classi... jealous, or somatic (related to bodi...

The most common delusions are lieve they or their loved ones are ch are convinced that someone is ch lowing, poisoning, or drugging ther gerate a slight or threat and try to t legally by appealing to courts and g sorting to violence against the peop institutions they feel have betraye

Those with erotic delusions (a er mania) believe that someone, usua them, not just on the basis of a sin cause of a deep, spiritual, romanti send letters and gifts, show up at h him or her. The data indicate tha ment for this problem are womer usually involve men. Erotic delu friends, girlfriends, and spouses ties sufficiently often for many p unwanted attention of delusiona harassment.

Those with grandiose delusio have great power and influence, talent, or have made a ground such individuals develop a del tionship with a prominent pers lieve that they actually are pre delusions, such as being sing religious cults.

Men and women with jealo sexual partner is unfaithful. for scraps of evidence (such a who hang up without speaki Some try to stop the imagine such as not letting the partn following the other "lover." O disorder physically attack th suspected lover.

Somatic delusions invol cal condition. Persons may odor, that insects have gott internal parasite, that cert and ugly, or that certain o turn to general medical p

Case 1:06-cv-00316-RBW Document 13 Filed 10/31/2007 Page 5 of 22

## Delusional disorder

**D**elusions are persistent beliefs a person holds in spite of all proof that they are false. Individuals with a delusional disorder have an unshakable false belief concerning events that occur in real-life circumstances. Thus, they may believe that a rock singer is in love with them, that a coworker is spying on them, or that a spouse is unfaithful. In psychiatric terms, their delusions are *well systematized*—that is, they fit into an elaborate conceptual scheme that makes sense to the individual—and *encapsulated*—meaning they do not intrude onto most aspects of the person's life. In contrast, the delusions that occur in persons with schizophrenia tend to be bizarre, as in believing, for example, that one has been befriended by Martians or that their internal organs are changing shape.

Delusional disorder is relatively uncommon. Although this condition accounts for 1 to 2 percent of all annual admissions to psychiatric hospitals, its actual incidence in the general population is estimated to be only around 0.03 percent. Many cases begin in middle or late adult life, and occur slightly more often in women than in men. The average age of onset is between thirty-five and forty-five.

The causes are not known. Psychosocial factors may lead to delusory delusions; one form described by mental health professionals migrating from one nation to another. Paranoid, schizoid, and other personality disorders (described in Chapter 21) may increase the likelihood of delusional disorders.

Most individuals with a delusional disorder look and act in ways that indicate they are talking about or acting on

become reclusive and socially isolated or behave in eccentric ways. Most delusions are classified as persecutory, erotic, grandiose, jealous, or somatic (related to bodily changes or symptoms).

The most common delusions are persecutory. Individuals believe they or their loved ones are being harmed in some way. They are convinced that someone is cheating, maligning, harassing, following, poisoning, or drugging them. As evidence, they may exaggerate a slight or threat and try to take defensive action, either legally by appealing to courts and government agencies, or by resorting to violence against the people they see as dangers or the institutions they feel have betrayed them.

Those with erotic delusions (a condition sometimes called *erotomania*) believe that someone, usually rich or famous, desires them, not just on the basis of a simple sexual attraction, but because of a deep, spiritual, romantic love. They may write, call, send letters and gifts, show up at the person's house, even stalk him or her. The data indicate that most of those who seek treatment for this problem are women, although police or court cases usually involve men. Erotic delusions typically involve former boyfriends, girlfriends, and spouses, but they are focused on celebrities sufficiently often for many public figures to consider the unwanted attention of delusional individuals a major source of harassment.

Those with grandiose delusions may be convinced that they have great power and influence, possess unrecognized ability or talent, or have made a groundbreaking discovery. Occasionally such individuals develop a delusion that they have a special relationship with a prominent person, such as the president, or believe that they actually are the president. Some people with grandiose delusions, such as being singled out by God, become leaders of religious cults.

Men and women with jealous delusions are convinced that their sexual partner is unfaithful. To prove infidelity, they may search for scraps of evidence (such as lipstick stains or phone callers who hang up without speaking) and then confront the partner. Some try to stop the imagined infidelity through drastic means, such as not letting the partner leave the house alone or secretly following the other "lover." Occasionally, individuals with this disorder physically attack their partner or, more rarely, the suspected lover.

Somatic delusions involve an imagined physical defect or medical condition. Persons may believe that they are giving off a foul odor, that insects have gotten under their skin, that they have an internal parasite, that certain parts of their body are misshapen and ugly, or that certain organs are not functioning. Usually they



disorder is Capgras' syndrome, in which individuals believe someone close to them has been replaced by a double and the person of being an impostor.

### ▼ Seeking help

Most individuals with delusional disorder have little or no insight into their problem and refuse to admit that anything is wrong with them. If you suspect that someone close to you may have this problem, these are the questions that should be asked:

- Does the person persistently hold on to a belief despite evidence that it is false?
- Does the delusion involve real-life people and situations?
- Does the person think that others are following, plotting against, or planning to harm him or her?
- Does the person think that someone loves him or her in a special way and wants his or her attention and devotion?
- Does the person believe that he or she has been granted some special power or unique talent?
- Is the person convinced that his or her spouse is having an affair, despite a lack of evidence?
- Does the person believe that he or she has a disease or physical abnormality, despite reassurance that nothing is wrong?
- Have the delusions lasted for at least one month?
- Except for the delusion and its ramifications, does the person's behavior seem normal?

If someone close to you answers "yes" to several of these questions, insist that he or she see a mental health professional, or consult one yourself. Diagnosis requires a careful examination to rule out physical causes, such as alcoholism, drug use, dementia, infections, and metabolic or hormonal disorders. Imaging of the brain with computed tomography (CT) or magnetic resonance imaging (MRI) can identify brain abnormalities that may cause delusions.

### ▼ Risks and complications

Sexual problems and depressive symptoms are common complications of delusional disorder. Those whose paranoid delusions lead to legal action against supposed enemies may devote huge amounts of time and money to litigation.

Violence is rare but can occur. In cases of erotomania, "stalkers" who act on their delusions may be hospitalized, legally restrained,

### ▼ Treating delusional disorder

Individuals with delusional disorder usually they have any problem and do not seek the by family members or by legal action, as wl violate a court injunction to stay away from have been stalking. It is important for pers to get into treatment and to become aware of medication and therapy.

Antipsychotic medications, such as pim delusions and anxiousness, although these disappear completely. Pimozide may relieve including the belief that some aspect of a p ugly; this particular delusion is also respor the selective serotonin reuptake inhibitors ric drugs, such as anti-anxiety medication: for symptoms that accompany these probl been systematically tested for delusional d

Psychotherapy also can contribute to re delusional disorder can establish trust and health professional, in time they may com their beliefs may be interfering with their l

- Non-bizarre delusions (involving real-life situ followed, poisoned, infected, loved at a distan or being deceived by a spouse or lover) last; month

- None of the symptoms of schizophrenia for n

- No impairment of functioning or obviously o except for the delusion and its ramifications

- Brief symptoms of mood disorders, if any

- Symptoms not caused by the direct effects of of abuse or a medication) or a general medic

Adapted from the Diagnostic and Statistical Manual of 4th Edition. Used with permission.

...iduals with this disorder are likely to have difficulty...friendships and marriages because of their tendency to...delusions about jealousy or betrayal. They may demand...reassurance that a partner is loving and faithful and may...picious of the spouse's friends and colleagues. Some ma...function well at work, while others develop occupational...as personal and social difficulties. Those with paranoid de...may suspect coworkers of trying to sabotage their projects...ing their ideas, or making critical comments to their bosses...accusations may alienate colleagues and lead to lasting rese...ment and conflict.

## Outlook

▼

Unlike those with schizophrenia, many individuals with delu...disorder can function fairly normally in the world, support th...selves, and remain employed. However, this is somewhat depe...dent on both the nature and the intensity of the delusion. It is...likely to be true of those whose delusions involve looking ugly or...giving off a foul smell or of those whose delusions come to domi...nate their lives. In some cases, particularly in jealous delusions,...the delusion disappears within a few months; but in most, espe...cially for persecutory delusions (which are the most common...type), the condition remains chronic, with the delusion waxing...and waning but persisting over time.

## Shared psychotic disorder

In this rare disorder, an individual in a close relationship with someone who has psychotic delusions develops a delusion that is similar in content. There is no sign of any prior psychotic disorder. Although as a rule only two people are involved in this disorder—hence, its other name, *folie à deux*—there have been cases in which as many as twelve persons in a family have shared the same delusion.

The shared delusion usually is realistic enough to be possible (although occasionally it is bizarre) and often is based on past experiences the two people have in common. For example, one spouse may convince the other that their food is being poisoned by recalling past incidents in which they did indeed suffer food poisoning. Usually the person who first developed the delusion is the dominant one in the relationship and gradually imposes his or her delusion on the more passive partner.

Although shared psychotic disorder can begin at any age, usually the people who share a delusion have lived together for a long

standing relationship is being thre...forces, such as one person's desir...change in the relationship.

Usually these individuals are le...function normally than those wit...or schizophrenia. If the relationshi...tial delusion ends, the delusional...the relationship endures, the co...unless treated.

Individuals rarely seek 'professi...disorder. A therapist learns abou...who first developed the delusion...that a partner or family members...specific treatment for this disorde...gest psychotherapy and antipsyc...establish trust and rapport and t...tected from any harm that might...of acting on the shared delusion.

disorder is Capgras' syndrome, in which individuals believe someone close to them has been replaced by a double, and the person of being an impostor.

## ▼ Seeking help

Most individuals with delusional disorder have little or no insight into their problem and refuse to admit that anything is wrong with them. If you suspect that someone close to you may have this problem, these are the questions that should be asked:

- Does the person persistently hold on to a belief despite evidence that it is false?
- Does the person think that others are following, plotting against, or planning to harm him or her?
- Does the person think that someone loves him or her in a special way and wants his or her attention and devotion?
- Does the person believe that he or she has been granted some special power or unique talent?
- Is the person convinced that his or her spouse is having an affair despite a lack of evidence?
- Does the person believe that he or she has a disease or physical abnormality, despite reassurance that nothing is wrong?
- Have the delusions lasted for at least one month?
- Except for the delusion and its ramifications, does the person's behavior seem normal?

If someone close to you answers "yes" to several of these questions, insist that he or she see a mental health professional, or consult one yourself. Diagnosis requires a careful examination to rule out physical causes, such as alcoholism, drug use, dementia, infections, and metabolic or hormonal disorders. Imaging of the brain with computed tomography (CT) or magnetic resonance imaging (MRI) can identify brain abnormalities that may cause delusions.

## ▼ Risks and complications

Sexual problems and depressive symptoms are common complications of delusional disorder. Those whose paranoid delusions lead to legal action against supposed enemies may devote huge amounts of time and money to litigation.

Violence is rare but can occur. In cases of erotomania, "stalkers" who act on their delusions may be hospitalized, legally restrained,

## ▼ Treating delusional disorder

or jailed; more than twenty state legislatures have any problem and do not seek the laws to protect potential victims. Recent res although violence is a danger in erotomania cant others are more likely to become the ta love object." However, there have been incid have assaulted and, in some cases, murder had watched and desired from afar.

Individuals with delusional disorder usually they have any problem and do not seek the by family members or by legal action, as w violate a court injunction to stay away from have been stalking. It is important for pers to get into treatment and to become aware of medication and therapy.

Antipsychotic medications, such as pim delusions and anxiousness, although these disappear completely. Pimozide may relieve including the belief that some aspect of a p ugly; this particular delusion is also respon the selective serotonin reuptake inhibitors ric drugs, such as anti-anxiety medication for symptoms that accompany these prob been systematically tested for delusional d

Psychotherapy also can contribute to re delusional disorder can establish trust and health professional. In time they may cont their beliefs may be interfering with their l

- Non-bizarre delusions (involving real-life situ followed, poisoned, infected, loved at a distan or being deceived by a spouse or lover) lastin month

- None of the symptoms of schizophrenia for n

- No impairment of functioning or obviously o except for the delusion and its ramifications

- Brief symptoms of mood disorders, if any

- Symptoms not caused by the direct effects of of abuse or a medication) or a general medic

Adapted from the Diagnostic and Statistical Manual of 4th Edition. Used with permission.

**relationships**

individuals with this disorder are likely to have difficulty maintaining friendships and marriages because of their tendency to... delusions about jealousy or betrayal. They may demand constant reassurance that a partner is loving and faithful and may become suspicious of the spouse's friends and colleagues. Some may... function well at work, while others develop occupational as well as personal and social difficulties. Those with paranoid delusions may suspect coworkers of trying to sabotage their projects, and... ing their ideas, or making critical comments to their bosses. These accusations may alienate colleagues and lead to lasting resent... ment and conflict.

## ▼ Outlook

Unlike those with schizophrenia, many individuals with delusional disorder can function fairly normally in the world, support themselves, and remain employed. However, this is somewhat dependent on both the nature and the intensity of the delusion. It is more likely to be true of those whose delusions involve looking ugly or giving off a foul smell or of those whose delusions come to dominate their lives. In some cases, particularly in jealous delusions, the delusion disappears within a few months; but in most, especially for persecutory delusions (which are the most common type), the condition remains chronic, with the delusion waxing and waning but persisting over time.

## Shared psychotic disorder

In this rare disorder, an individual in a close relationship with someone who has psychotic delusions develops a delusion that is similar in content. There is no sign of any prior psychotic disorder. Although as a rule only two people are involved in this disorder—hence, its other name, *folie à deux*—there have been cases in which as many as twelve persons in a family have shared the same delusion.

The shared delusion usually is realistic enough to be possible (although occasionally it is bizarre) and often is based on past experiences the two people have in common. For example, one spouse may convince the other that their food is being poisoned by recalling past incidents in which they did indeed suffer food poisoning. Usually the person who first developed the delusion is the dominant one in the relationship and gradually imposes his or her delusion on the more passive partner.

Although shared psychotic disorder can begin at any age, usually the people who share a delusion have lived together for a long

standing relationship is being thre... forces, such as one person's desire... change in the relationship.

Usually these individuals are le... function normally than those wit... or schizophrenia. If the relationshi... tial delusion ends, the delusional... the relationship endures, the con... unless treated.

Individuals rarely seek professi... disorder. A therapist learns abou... who first developed the delusion... that a partner or family members... specific treatment for this disorde... gest psychotherapy and antipsyc... establish trust and rapport and t... tected from any harm that might... of acting on the shared delusion.

# Mentally ill lose rights more

When I was going to college, a psychology teacher described a research project carried out by a professor at a school that included medical facilities. The students in his class were instructed to go to the emergency unit of the teaching hospital and report to the intern on duty that they "heard the word boom" when no one was around. The students went individually, on different days.

## Opening doors

### MONA HUGHES

None of the students were mentally ill, yet all were admitted to the psychiatric unit of the hospital for an evaluation and given medications. (Each student found his or her own way to avoid taking them.) During their time in the psychiatric unit they each took notes about their experience and what was happening. In every case the case file on the "patient/student" described "obsessive note-taking" behaviors.

At the end of the semester, the professor reported his research to the board of directors of the teaching hospital. He stated that in every case, the students were inappropriately admitted to the psychiatric unit and medicated. He also stated that he planned to do the research project again, but would not say when it would happen.

**The result of the research was a considerable drop in admissions to the psychiatric unit. The misdiagnosis of these students does make you think about the possibility of others who may have** been misdiagnosed, labeled and stigmatized by a system that may be too quick to rush to judgment about mental or emotional disorders that are in reality situational problems.

I interviewed one woman who spent years in the mental health system when she was diagnosed with clinical depression after her first child was stillborn. No one

**Whom to contact**

National Council on Disability
1331 F St. NW, Suite 1050
Washington, D.C. 20004
202-272-2004 voice, 202-272-2074 TTY, 202-272-2022 fax.
http://www.ncd.gov/newsroom/publications/privileges.html

# than others with disabilities

seemed to recognize that she really did have a reason to feel depressed and needed emotional support, rather then heavy medication and hospitalization to cope with the situation.

That doesn't mean there are not times when "postpartum blues," a condition that happens to some women after childbirth, requires medical intervention. But not every case of deep depression, particularly after the loss of a child, is a mental disorder.

In January of this year, the National Council on Disability (NCD), an independent federal agency mandated to make recommendations to the president and Congress on disability issues, sent a report titled *Privileges to Rights: People Labeled with Psychiatric Disabilities Speak for Themselves.* The report is based on the testimony of people with psychiatric disabilities at an NCD hearing in 1998.

Basically this report stated that people with psychiatric disabilities are routinely deprived of their rights in a way no other disability group has been.

NCD requested the primary participants in this hearing give their own thoughts about the system. Those diagnosed with psychiatric disabilities testified passionately and eloquently about the mistreatment they had experienced or witnessed, and gave their proposals for viable change.

The testimony graphically described how people with psychiatric disabilities have been beaten, raped, shocked, overmedicated (often against their will), isolated, incarcerated, restricted, deprived of food and bathroom privileges, and physically and psychologically abused in the very institutions that are supposed to be helping them, and in their own communities.

Their testimonies pointed to the inescapable fact that people with psychiatric disabilities are systematically and routinely deprived of their rights, and treated as less than full citizens or full human beings.

These are our brothers and sisters living with a disability. We should not close our eyes to their needs. We should find ways to learn to live with and help each other.

I can't help but wonder what a research project would look like that was aimed at the way the physically disabled are treated in hospitals, nursing homes and other facilities. We might find the similarities are too close.

k v. Department of Justice

⸱AL EMPLOYMENT OPPORTUNITY COMMISSION
⸱ngton, D.C.  20507

David E. Stock,                )
  Appellant,                   )
                               )
v.                             )  Request No. 05980053
                               )  Appeal  No. 01953223
Janet Reno,                    )
Attorney General,              )
Department of Justice,         )
  Agency.                      )
                               )



DENIAL OF REQUEST TO RECONSIDER

INTRODUCTION

On October 14, 1997, the Department of Justice (hereinafter referred to
as agency), initiated a request to the Equal Employment Opportunity
Commission (EEOC) to reconsider the decision in David E. Stock
v. Department of Justice, EEOC Appeal No. 01953223 (September 12, 1997).
EEOC Regulations provide that the Commissioners may, in their discretion,
reconsider any previous Commission decision.  29 C.F.R. §1614.407(a).
The party requesting reconsideration must submit written argument or
evidence which tends to establish one or more of the following criteria:
new and material evidence is available that was not readily available
when the previous decision was issued, 29 C.F.R. §1614.407(c)(1);
the previous decision involved an erroneous interpretation of law,
regulation, or material fact, or a misapplication of established
policy, 29 C.F.R. §1614.407(c)(2); and the previous decision is of such
exceptional nature as to have substantial precedential implications,
29 C.F.R. §1614.407(c)(3).

ISSUE PRESENTED

The issue presented is whether the agency has submitted sufficient
argument or evidence establishing that it was erroneously found in the
previous decision that the agency failed to prove by clear and convincing
evidence that appellant would not have been selected for the position
of Special Agent, absent the discrimination.

BACKGROUND

Appellant filed a complaint of disability (perceived) discrimination
alleging that he was discriminated against in 1989 when he was not
selected for the position of Special Agent with the Drug Enforcement
Agency.  Appellant alleged that the agency perceived that he was disabled
because of a previous back injury that he sustained.  Subsequent to an
investigation by the agency, a hearing before an EEOC Administrative
Judge (AJ) was held.  In a recommended decision issued subsequent to the
hearing by a second AJ, it was held that appellant was discriminated
against based upon a perceived disability, and the agency failed to
show by clear and convincing evidence the appellant would not have

Ver. 9

been selected absent the discrimination.<1>  In its final decision, the agency agreed with the AJ's finding that statements made by one of the selecting officials were tantamount to direct evidence of discrimination.<2>  Nonetheless, the agency held that because there were other legitimate concerns about appellant's ability to do the job, a mixed motive analysis under Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) was appropriate.<3>  Accordingly, the agency contended that the AJ erroneously applied a "clear and convincing" standard to the remedy phase of the case.  The agency maintained that the appropriate standard was a "preponderance of the evidence" standard, and that it had met this burden.  When appellant appealed this decision to the Commission, the findings of the AJ were upheld.  The agency was ordered to offer appellant employment as a Special Agent, and all appurtenant back pay and benefits from 1989.

In its request for reconsideration, the agency reiterates its contention that the proper standard for determining the remedial phase of this case is a "preponderance of the evidence" standard as articulated in Price Waterhouse.  Even so, the agency contends that it has met the "clear and convincing" standard through the testimony of the selecting official, who uttered the discriminatory statements about appellant's physical condition.  The agency maintains that this selecting official had other legitimate concerns about appellant's ability to accept criticism and display the appropriate level of aggressiveness.  In dispute of the AJ's finding that these statements were "post hoc rationalizations" the agency argued that these valid concerns were evident prior to the decision to reject appellant's application.  In addition, the agency notes that the selecting official with selecting authority declined to overrule the decision to reject appellant because he had concerns about appellant's integrity, given the inconsistency between statements on appellant's SF-171 and his letter to the Veterans Administration asking for an increase in his disability rating.  Finally, the agency disputes the AJ's finding that the initial reason provided to appellant to justify his rejection was a pretext for discrimination.  Although the agency admitted that it "incorrectly" informed appellant that he was rejected because of his age, the agency stated that this reason was offered because it was agency practice to reject applicants who were close to exceeding the age requirement, and who were not among the best qualified.

The Commission notes that appellant filed a response to the agency's request in which he avers that the agency has not presented any evidence to show that the Commission improperly considered the evidence or erroneously interpreted the law.

ANALYSIS AND FINDINGS

After a review of the agency's request to reconsider, the previous decision, and the entire record, the Commission finds that the agency's request fails to meet the criteria of 29 C.F.R. §1614.407(c), and it is the decision of the Commission to deny the agency's request.

The main contention presented by the agency in its request is the same as that presented in its final decision, that there were other legitimate reasons for rejecting appellant.  The agency attempts to show in its request that these legitimate concerns provided sufficient justification for rejecting appellant, either under a "preponderance of the evidence" or "clear and convincing evidence" standard.

Despite the agency's arguments to the contrary, the Commission has reviewed the agency's reasons for rejecting appellant in great detail.

We find that the conclusions of the AJ, as confirmed in the previous
decision, are upheld by the record.  Under either a "preponderance of
the evidence" or a "clear and convincing evidence" standard, the agency
has not shown that it would have rejected appellant in the absence of
discrimination.  Although the agency cites the selecting official's
concerns about appellant's ability to accept criticism and display
appropriate aggressiveness, the Commission notes that these "concerns"
were raised by the same individual whose comments were tantamount to
direct evidence of discrimination.  Accordingly, we find little merit in
this argument.  In addition, a close examination of the integrity concerns
purportedly held by another selecting official, reveals that the concerns
emanated from the letter appellant wrote to the Veterans Administration.
We agree with the AJ that concern about the letter is tantamount to
concern about appellant's physical condition.  Finally, we also place
no merit in the agency's argument that the reliance on appellant's age
as a reason for the rejection was not a pretext for discrimination,
because this was agency "policy".  It is clear that the application of
the "policy" in this case was a pretext for discrimination.

CONCLUSION

After a review of the agency's request for reconsideration, the previous
decision, and the entire record, the Commission finds that the agency's
request fails to meet any of the criteria of 29 C.F.R. §1614.407(c).
It is therefore the decision of the Commission to deny the agency's
request.  The decision in EEOC Appeal No. 01953223 (September 12, 1997)
remains the Commission's final decision.  There is no further right
of administrative appeal from the decision of the Commission on this
request for reconsideration.

ORDER (D1092)

The agency is ORDERED to take the following remedial action:

Within thirty (30) days of the date on which this decision becomes
final, the agency shall offer appellant employment as a Special Agent,
substantially similar to the offer of employment he would have received
if hired in 1989, together with back pay and all benefits to which he
would have been entitled.  Appellant shall be afforded fifteen (15) days
to accept or decline the offer of employment.  If appellant declines
the offer, his entitlement to back pay and benefits shall cease as of
the date on which the offer is declined.

The agency shall determine the appropriate amount of back pay,
with interest, and other benefits due appellant, pursuant to 29
C.F.R. §1614.501, no later than sixty (60) calendar days after the date
this decision becomes final.  Appellant shall cooperate in the agency's
efforts to compute the amount of back pay and benefits due, and shall
provide all relevant information requested by the agency.  If there
is a dispute regarding the exact amount of back pay and/or benefits,
the agency shall issue a check to appellant for the undisputed amount
within sixty (60) calendar days of the date the agency determines the
amount it believes to be due.  Appellant may petition for enforcement or
clarification of the amount in dispute.  The petition for clarification
or enforcement must be filed with the Compliance Officer, at the address
referenced in the statement entitled "Implementation of the Commission's
Decision."

The agency is further directed to submit a report of compliance, as
provided in the statement entitled "Implementation of the Commission's

Decision." The report shall include supporting documentation of the agency's calculation of back pay and other benefits due appellant, including evidence that the corrective action has been implemented.

IMPLEMENTATION OF THE COMMISSION'S DECISION (K0595)

Compliance with the Commission's corrective action is mandatory. The agency shall submit its compliance report within thirty (30) calendar days of the completion of all ordered corrective action. The report shall be submitted to the Compliance Officer, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036. The agency's report must contain supporting documentation, and the agency must send a copy of all submissions to appellant. If the agency does not comply with the Commission's order, appellant may petition the Commission for enforcement of the order. 29 C.F.R. §1614.503 (a). Appellant also has the right to file a civil action to enforce compliance with the Commission's order prior to or following an administrative petition for enforcement. See 29 C.F.R. §§1614.408, 1614.409, and 1614.503 (g). Alternatively, appellant has the right to file a civil action on the underlying complaint in accordance with the paragraph below entitled "Right to File a Civil Action." 29 C.F.R. §§1614.408 and 1614.409. A civil action for enforcement or a civil action on the underlying complaint is subject to the deadline stated in 42 U.S.C. §2000e-16(c)Supp. V 1993). If appellant files a civil action, the administrative processing of the complaint, including any petition for enforcement, will be terminated. See 29 C.F.R. §1614.410.

POSTING ORDER (G1092)

The agency is ORDERED to post copies of the attached notice at its Washington, D.C., main offices of the Drug Enforcement Administration. Copies of the notice, after being signed by the agency's duly authorized representative, shall be posted by the agency within thirty (30) calendar days of the date this decision becomes final, and shall remain posted for sixty (60) consecutive days, in conspicuous places, including all places where notices to employees are customarily posted. The agency shall take reasonable steps to ensure that said notices are not altered, defaced, or covered by any other material. The original signed notice is to be submitted to the Compliance Officer at the address cited in the paragraph entitled "Implementation of the Commission's Decision," within ten (10) calendar days of the expiration of the posting period.

ATTORNEY'S FEES (H1092)

If appellant has been represented by an attorney (as defined by 29 C.F.R. §1614.501 (e)(1)(iii)), he/she is entitled to an award of reasonable attorney's fees incurred in the processing of the complaint. 29 C.F.R. §1614.501 (e). The award of attorney's fees shall be paid by the agency. The attorney shall submit a verified statement of fees to the agency -- not to the Equal Employment Opportunity Commission, Office of Federal Operations -- within thirty (30) calendar days of this decision becoming final. The agency shall then process the claim for attorney's fees in accordance with 29 C.F.R. §1614.501.

RIGHT TO FILE A CIVIL ACTION (R0993)

This is a decision requiring the agency to continue its administrative processing of your complaint. However, if you wish to file a civil action, you have the right to file such an action in an appropriate United States District Court. It is the position of the Commission

that you have the right to file a civil action in an appropriate United States District Court WITHIN NINETY (90) CALENDAR DAYS from the date that you receive this decision. You should be aware, however, that courts in some jurisdictions have interpreted the Civil Rights Act of 1991 in a manner suggesting that a civil action must be filed WITHIN THIRTY (30) CALENDAR DAYS from the date that you receive this decision. To ensure that your civil action is considered timely, you are advised to file it WITHIN THIRTY (30) CALENDAR DAYS from the date that you receive this decision or to consult an attorney concerning the applicable time period in the jurisdiction in which your action would be filed. In the alternative, you may file a civil action AFTER ONE HUNDRED EIGHTY (180) CALENDARS DAYS of the date you filed your complaint with the agency, or filed your appeal with the Commission. If you file a civil action, YOU MUST NAME AS THE DEFENDANT IN THE COMPLAINT THE PERSON WHO IS THE OFFICIAL AGENCY HEAD OR DEPARTMENT HEAD, IDENTIFYING THAT PERSON BY HIS OR HER FULL NAME AND OFFICIAL TITLE. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work. Filing a civil action will terminate the administrative processing of your complaint.

RIGHT TO REQUEST COUNSEL (Z1092)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. See Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq.; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§791, 794(c). The grant or denial of the request is within the sole discretion of the Court. Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File a Civil Action").

FOR THE COMMISSION:

JAN 8, 1999
Date

Frances M. Hart
Executive Officer
Executive Secretariat

This Notice is posted pursuant to an Order by the United States Equal Employment Opportunity Commission dated_____which found that a violation of the Rehabilitation Act of 1973, as amended, 29 U.S.C. §791 et seq., has occurred at this facility.

Federal law requires that there be no discrimination against any employee or applicant for employment because of that person's RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE, or PHYSICAL or MENTAL DISABILITY with respect to hiring, firing, promotion, compensation, or other terms, conditions, or privileges of employment.

The Department of Justice, Drug Enforcement Administration, supports and will comply with such Federal law and will not take action against individuals because they have exercised their rights under law.

The Department of Justice, Drug Enforcement Administration, has been found to have discriminated against the individual affected by the Commission's finding. The Department of Justice, Drug Enforcement Administration, shall offer the affected individual employment as a Special Agent, together with back pay and benefits. The Department of Justice, Drug Enforcement Administration, will ensure that officials responsible for personnel decisions and terms and conditions of employment will abide by the requirements of all Federal equal employment opportunity laws and will not retaliate against employees who file EEO complaints.

The Department of Justice, Drug Enforcement Administration, will not in any manner restrain, interfere, coerce, or retaliate against any individual who exercises his or her right to oppose practices made unlawful by, or who participates in proceedings pursuant to, Federal equal employment opportunity law.

---

Date Posted: _____

Posting Expires: _____

29 C.F.R. Part 1614

1 The Commission notes that the original AJ retired after the hearing was held. Upon agreement of the parties, a second AJ reviewed the entire record and issued the recommended decision which is at issue in this case.

2 The selecting official stated, "[w]ith regard to selection of DEA agents, it is my first preference to hire someone who is 100% fit over someone who is 90% or 70% fit or capable of doing the job."

3 The agency correctly noted that since appellant filed his complaint in February 1990, the Civil Rights Act of 1991 was not applicable to this case.

Eileen Morales v. Department of Veterans Affairs
01A10627
March 23, 2001


Eileen Morales,
Complainant,

v.

Anthony J. Principi,
Secretary,
Department of Veterans Affairs,
Agency.

Appeal No. 01A10627

Agency No. 98-4899

Hearing No. 350-AO-8050X

DECISION

The complainant timely initiated an appeal from the agency's final
order concerning her equal employment opportunity (EEO) complaint of
unlawful employment discrimination in violation of Section 501 of the
Rehabilitation Act of 1973 (Rehabilitation Act), as amended, 29 U.S.C. §
791 et seq. The appeal is accepted pursuant to 29 C.F.R. § 1614.405.
The complainant alleges she was discriminated against on the basis
of disability[1] (right lateral epicondylitis) when she was not hired
for the position of Medical Records Clerk/Typist GS-4 after failing a
physical examination.

For the following reasons, the Commission VACATES the agency's final
order and REMANDS the matter for a hearing.

The record reveals that the complainant, an applicant for the position
of Medical Records Clerk/Typist at the agency's Medical Center in
Albuquerque, New Mexico, filed a formal EEO complaint with the agency
on or about January 20, 1999, alleging that the agency had discriminated
against her as referenced above.

At the conclusion of the investigation, the complainant was provided a
copy of the investigative report and requested a hearing before an EEOC
Administrative Judge (AJ). The AJ issued a decision without a hearing,
finding no discrimination. The AJ concluded that the complainant failed
to establish a genuine issue of material fact that she was regarded or
**perceived** as disabled.
As an initial matter, the AJ decided that the complainant only
asserted the claim that she was regarded as disabled and not that she
was an individual with a disability who was entitled to a reasonable
accommodation.

Regarding her claim that she was **perceived** or regarded as disabled, the
AJ reasoned that there was no dispute the complainant made statements
that she could not perform a job which required continuous pushing,
pulling and grasping. She also concluded that the complainant's
physicians' statements also reached the conclusion that she could not
perform continuous pushing, pulling and grasping. The position at issue,
the AJ concluded, required "simple grasping as a continuous function
which was required to be performed up to 8 hours a day, making it one of

Ex. 10

the essential functions of the job." Decision p. 8.  As a footnote to
this conclusion, the AJ  acknowledged that "there is a dispute of fact
regarding exactly how essential the continuous grasping requirement was
in the medical clerk job" but she dismissed the issue as not material
because it was only relevant to whether the complainant was entitled to
a reasonable accommodation.  Decision p. 8.  Having already found that
the complainant did not claim she was disabled, the AJ did not reach
the issue of reasonable accommodation.

The AJ found there was no evidence the agency regarded the complainant
as substantially limited in the major life activity of performing manual
tasks, in general, but she reasoned that the agency was only concerned
with the more narrow issue of her ability to continuously pull, push
and grasp based on her past medical history.

The AJ also concluded that the agency did not regard the complainant
as substantially limited in the major life activity of working because
the medical clerk position would not constitute a class or broad range
of jobs.  She did find that "the employer regarded complainant as unable
to perform one particular job for one particular employer." Decision p. 9.

The agency's final order implemented the AJ's decision.

On appeal, the complainant contended that the AJ's entry of summary
judgment was in error because in a case involving the agency's perception
of the complainant's disability, it was necessary to determine the
agency's "state of mind" and the veracity of its statements.  Where
such findings are necessary, summary judgment would be improper. The
complainant further argued that the AJ was required to view the evidence
in the light most favorable to her in determining whether summary judgment
was appropriate but the AJ failed to consider the evidence presented
by her.  The complainant argued that she presented evidence to show that
she applied for a broad range of positions under continuous recruitment
announcements but that the agency failed to consider her for any position
after her physical examination.  Thus, she argued, there was a question
of fact whether the agency disqualified her based on its conclusion that
she was substantially limited in the major life activity of working.

Finally, the complainant argued that because the agency concluded she
was not qualified for positions requiring "continuous grasping," the AJ
erred in not determining whether this particular criteria was unique to
one position or a broad range of jobs.

ANALYSIS AND FINDINGS

The U.S. Supreme Court has held that summary judgment is appropriate where
a court determines that, given the substantive law, no genuine issue of
material fact exists.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
255 (1986).  In ruling on a motion for summary judgment, a court does
not sit as a fact finder. Id.  The evidence of the non-moving party must
be believed at the summary judgment stage and all justifiable inferences
must be drawn in the non-moving party's favor.  Id.  An issue is "genuine"
if the evidence is such that a reasonable fact-finder could find in favor
of the non-moving party. Celotex v. Catrett, 477 U.S. 317, 322-23 (1986)
; Oliver v. Digital Equip. Corp., 846 F2d. 103, 105 (1st Cir. 1988).
A fact is "material" if it has the potential to affect the outcome
of the case.  If a case can only be resolved by weighing conflicting
evidence, summary judgment is not appropriate.  In the context of an
administrative proceeding under Title VII, an AJ may properly consider
summary judgment only upon a determination that the record has been
adequately developed for summary disposition.

In our review of the record, it was not clear, as the AJ stated, that the
complainant only claimed she was **perceived** as disabled and did not claim

she was actually disabled within the meaning of the law.  The record
indicates, the complainant made several arguments in her opposition to
summary judgment related to the agency's failure to consider whether
it could accommodate her condition if she was otherwise qualified for
the position.  At the same time, she contended that she was able to
perform most clerical type positions, that she currently worked in a
clerical position and had worked in other clerical positions since she
had taken physical therapy for her right arm.  Therefore, she presented
three potential claims - that she was not hired for the position of
Medical Records Clerk/Typist because of her disability even though she
could perform the essential functions of the position with or without
an accommodation; and that she had a record of a disability but her
condition did not now "disqualify" her from performing the essential
functions of the position in question.  It is also possible that the
complainant could claim she was **perceived** as disabled if it is shown
she does not currently have an impairment which substantially limits a
major life activity but was treated as such.  See EEOC Compliance Manual
No. 915.002 at p. 902-43 (3/14/95).

With that in mind, we conclude the AJ erred in not determining whether
the complainant was a qualified individual with a disability.  She also
erred in not resolving what she herself identified as a genuine dispute
of material fact whether continuous grasping, pushing and pulling were
essential functions of the Medical Records Clerk/ Typist position.  This
was a critical analysis that should not have been omitted.  The record is
ambiguous on this point where the position description does not clearly
indicate that these types of activities were required on a continuous
basis but on the worker's compensation form CA-1 it concluded that
continuous grasping was required.  Therefore, there remains a question
whether the essential functions of the position included a continuous
grasping motion.

Other evidence in the record raised questions of fact regarding the
complainant's present medical condition. For instance, the evidence was
inconclusive whether the complainant was permanently unable to perform
certain manual tasks.  The only medical records in evidence were those of
the complainant's previous employer after a fitness for duty examination
two or more years prior,  and a record from the complainant's physician
stating that she was presently able to perform the job in question.
The complainant's previous employer determined that she was fit for
duty but had certain undefined "permanent restrictions".  In contrast,
the complainant testified that the position for which she was being
considered, required the same kinds of things she was presently doing
in another job.  Finally, the agency's physician concluded that the
complainant's examination was "normal" but that the complainant was
not qualified for the position based on the statements the complainant
made regarding her previous worker's compensation claim.  Based on these
examples and other evidence in the record, the conflict in the evidence
was apparent and raised a genuine issue regarding whether she presently
had an impairment that substantially limited a major life activity, had
a record or history of one or was **perceived** as having one.  Consequently,
summary judgment was not appropriate in this case.

Similarly, the agency's physician's conclusion appears to be based on
the complainant's past record and not on her objective findings after
the examination.  Based on this evidence, the AJ must determine whether
the basis for the physician's disqualification of the complainant was
for a reason that violates the Rehabilitation Act.

The complainant also argued in her opposition to summary judgment that
she was wrongly denied the position based on a pre-employment examination.
Under our regulations, an employer may administer a physical examination
administered after making a conditional offer of employment as long as
is administered without regard to disability.  29 C.F.R. §1630.14.

On this issue the record was not sufficiently developed and on remand, the necessary evidence should be explored to make a determination.

CONCLUSION

Therefore, after a careful review of the record, the Commission finds that the AJ erred in granting summary judgment and that there were genuine issues of material fact in dispute which required a hearing. The Commission REVERSES the agency's final order and REMANDS the matter to the appropriate hearing unit for further action consistent with the ORDER below.


ORDER

The agency shall submit to the Hearings Unit of the Phoenix District Office the request for a hearing within fifteen (15) calendar days of the date this decision becomes final. The agency is directed to submit a copy of the complaint file to the EEOC Hearings Unit within fifteen (15) calendar days of the date this decision becomes final. The agency shall provide written notification to the Compliance Officer at the address set forth below that the complaint file has been transmitted to the Hearings Unit. Thereafter, the Administrative Judge shall issue a decision on the complaint in accordance with 29 C.F.R. § 1614.109 and the agency shall issue a final action in accordance with 29 C.F.R. § 1614.110.

IMPLEMENTATION OF THE COMMISSION'S DECISION (K0900)

Compliance with the Commission's corrective action is mandatory. The agency shall submit its compliance report within thirty (30) calendar days of the completion of all ordered corrective action. The report shall be submitted to the Compliance Officer, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036. The agency's report must contain supporting documentation, and the agency must send a copy of all submissions to the complainant. If the agency does not comply with the Commission's order, the complainant may petition the Commission for enforcement of the order. 29 C.F.R. § 1614.503(a). The complainant also has the right to file a civil action to enforce compliance with the Commission's order prior to or following an administrative petition for enforcement. See 29 C.F.R. §§ 1614.407, 1614.408, and 29 C.F.R. § 1614.503(g). Alternatively, the complainant has the right to file a civil action on the underlying complaint in accordance with the paragraph below entitled "Right to File A Civil Action." 29 C.F.R. §§ 1614.407 and 1614.408. A civil action for enforcement or a civil action on the underlying complaint is subject to the deadline stated in 42 U.S.C. § 2000e-16(c)(Supp. V 1993). If the complainant files a civil action, the administrative processing of the complaint, including any petition for enforcement, will be terminated. See 29 C.F.R. § 1614.409.


STATEMENT OF RIGHTS - ON APPEAL

RECONSIDERATION (M0900)

The Commission may, in its discretion, reconsider the decision in this case if the complainant or the agency submits a written request containing arguments or evidence which tend to establish that:

1. The appellate decision involved a clearly erroneous interpretation of material fact or law; or

2. The appellate decision will have a substantial impact on the policies, practices, or operations of the agency.

Requests to reconsider, with supporting statement or brief, must be filed with the office of federal operations (OFO) within thirty (30) calendar days of receipt of this decision or within twenty (20) calendar days of receipt of another party's timely request for reconsideration. See 29 C.F.R. § 1614.405; Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), 9-18 (November 9, 1999). All requests and arguments must be submitted to the Director, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036. In the absence of a legible postmark, the request to reconsider shall be deemed timely filed if it is received by mail within five days of the expiration of the applicable filing period. See 29 C.F.R. § 1614.604. The request or opposition must also include proof of service on the other party.

Failure to file within the time period will result in dismissal of your request for reconsideration as untimely, unless extenuating circumstances prevented the timely filing of the request. Any supporting documentation must be submitted with your request for reconsideration. The Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances. See 29 C.F.R. § 1614.604(c).

COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (R0900)

This is a decision requiring the agency to continue its administrative processing of your complaint. However, if you wish to file a civil action, you have the right to file such action in an appropriate United States District Court within ninety (90) calendar days from the date that you receive this decision. In the alternative, you may file a civil action after one hundred and eighty (180) calendar days of the date you filed your complaint with the agency, or filed your appeal with the Commission. If you file a civil action, you must name as the defendant in the complaint the person who is the official agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work. Filing a civil action will terminate the administrative processing of your complaint.

RIGHT TO REQUEST COUNSEL (Z1199)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. See Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794(c). The grant or denial of the request is within the sole discretion of the Court. Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File A Civil Action").

FOR THE COMMISSION:

_____
Carlton M. Hadden, Director
Office of Federal Operations

3/23/01
Date

CERTIFICATE OF MAILING

For timeliness purposes, the Commission will presume that this decision
was received within five (5) calendar days after it was mailed.  I certify
that this decision was mailed to complainant, complainant's representative
(if applicable), and the agency on:

_____
Date


_____
Equal Opportunity Assistant


1The record reflects that the complainant withdrew age and national
origin as bases for her claim of discrimination.